IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 28, 2016 Session


**WILLIAM LANE LANIER v. CORIE J. LANIER**

**Appeal from the Chancery Court for Marshall County**
**No. 14072     J. B. Cox, Chancellor**

_____

**No. M2014-02293-COA-R3-CV – Filed December 9, 2016**
_____

The Mother and Father of three children were divorced in 2007; in the parenting plan Father was designated primary residential parent, and Mother and Father received equal parenting time. Five years after entry of the plan, the trial court found a material change in circumstances with respect to the oldest child; determined that modification of the parenting plan was in her best interest; and reduced Mother's parenting time with that child. Seven months later, Mother filed a petition to modify the plan; Father answered and filed a counter-petition for contempt and modification of the parenting plan based on changed circumstances. A hearing was held on both petitions and the trial court entered an order which, *inter alia*, gave Father sole decision-making responsibility with respect to each of the children and reduced Mother's parenting time. Both parties appeal, raising numerous issues. We vacate that portion of the judgment that sets the parenting time during the children's vacation schedule and remand this issue for further consideration; in all other respects we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Vacated in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Michael T. Fort and William P. Holloway, Franklin, Tennessee, for the appellant, Corie Dizol.

Quinn Brandon Stewart, Lewisburg, Tennessee, for the appellee, William Lanier.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Corie Dizol ("Mother") and William Lanier ("Father") were divorced on February 21, 2007. The final decree approved and adopted an agreed permanent parenting plan designating Father as primary residential parent of the parties' three children and giving Mother and Father equal parenting time on a week on, week off basis. On October 10, 2012, the trial court entered an order (referred to herein as "the 2012 plan") finding a material change of circumstance with respect to the oldest child, who was 13 at the time, and reduced Mother's parenting time to 124 days with the oldest child, to be exercised every other weekend and every Wednesday afternoon until Thursday morning during the school year, and on a week on, week off basis during the summer months.

On May 3, 2013, Mother filed a petition to modify the 2012 plan, stating that Father's and the oldest child's behavior warranted a modification of the plan to "allow[] Father every other weekend parenting time and provid[e] Mother with decision making authority for all the parties' children." Father answered and filed a counter-petition for contempt; Father also sought modification of the 2012 plan based on changed circumstances as well as Mother's and Stepfather's alleged misbehavior with respect to co-parenting the children.[1] A hearing was held on the two petitions on June 19, 2014, and on September 16, the trial court issued a Memorandum, incorporated into an order entered on October 21, in which the court adopted a plan which, *inter alia*, reduced Mother's parenting time to 147 days with the two youngest children; increased her parenting time with the oldest child to 147 days; and modified the children's vacation schedules.

Both Mother and Father appeal. Mother contends that the trial court erred in finding that a material change of circumstance existed in such manner as to justify a modification of the plan, and in holding that a new parenting schedule was in the best interest of the children; in naming Father sole decision-maker; in finding the minor children to be more credible than Mother's husband ("Stepfather"); in declining to modify the oldest child's vacation schedule; and in declining to award her attorney's fees. Father argues that the trial court erred in calculating Mother's income for the purpose of calculating child support and in not crediting him for health insurance payments that he made directly to his wife ("Stepmother") for the children's coverage.

---

[1] Father amended his counter-petition to add a cause of action for fraud based on Mother's alleged falsification of tax documents; prior to trial, Father filed a notice that he would not pursue the fraud claim.

## II. STANDARD OF REVIEW

Modifying a parenting schedule is a two-step procedure in which the court must first determine whether a material change in circumstance has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(C); *Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013). If so, the court is to consider the factors set forth at Tennessee Code Annotated section 36-6-106(a) to determine whether modification of the schedule is in the best interest of the child. *Armbrister*, 414 S.W.3d at 698.

A trial court's "determinations of whether a material change in circumstance has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review the trial court's factual findings *de novo* with a presumption that they are correct unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013). Evidence preponderates against the trial court's findings of fact when it supports another finding of fact with greater convincing effect. *See Walker v. Sidney Gilreath & Associates*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). "We will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case." *Boyer v. Heimermann*, 238 S.W.3d 249, 254-55 (Tenn. Ct. App. 2007); *see also* Tenn. R. App. P. 36(b).

## III. MODIFICATION OF THE PARENTING PLAN

### A. Material Change in Circumstance

After making ninety-five findings of fact, the court discussed the legal standard applicable to its analysis and concluded[2]:

> Clearly there have been several material changes in the circumstances of the children that have occurred. [1.] Mother has carried her burden of proving that the children's uncle drove them in the car while under the influence of alcohol. She has not shown that Father knew that he had been drinking but nonetheless it directly affects the children. [2.] Mother has proven that Father has not cooperated in co-parenting with her. [3.] Mother and Father have not cooperated about eyeglasses, braces, clothing moving from one home to the other, and the list goes on. [4.] Father has shown that Mother has not cooperated in the co-parenting process with him by virtue of the sheer volume of her filings.

---

[2] To facilitate our discussion of this issue, we have numbered the factual findings in the conclusion.

[5.] Father has shown that Step-Father has given the children shots without consulting a physician and without his consent. [6.] Father has shown that Step-Father surrendered his rights to his son without real consultation with Mother.

[7.] Both parents have fostered an atmosphere that cannot be healthy for the minor children due to their continued animosity and lack of cooperation. These children are under great stress due to their parents' conflict.

Not every material change is a negative one. [8.] There have also been positive changes in the residence, work and church environment for Mother and Step-Father. [9.] On at least one occasion, Mother and Father initially cooperated to deal with [one child]'s pornography issues and her issues with contacting [an older male]. Clearly, there are more than enough material changes that affect the best interests of the children for the court to consider modification of the parenting plan.

The court proceeded to discuss the applicable statutory factors and reduced Mother's parenting time with the two youngest children from 182.5 days to 147 days.

In her brief on appeal, Mother agrees that findings (1), (2), (6), and (8) support the determination of a material change in circumstance; she contends that findings (3), (4), (5), (7), and (9) either do not constitute a material change in circumstance or are unsupported by the record. She argues that "not all of the material changes found by the trial court are accurate." We construe Mother's statement that the changes are not accurate to assert that the evidence does not support the factual basis cited by the court, and will review the evidence to determine if it preponderates against the factual findings.

Finding (3). Mother argues that there is no proof in the record that she was uncooperative relative to eyeglasses, braces, clothing, and moving between homes. Neither party has cited to testimony or other proof relative to these specific matters, other than Father's testimony that he did not know that the oldest child's dentist recommended braces and that he did not want her to get braces because, due to her history of brain surgeries, she regularly undergoes MRI procedures, and her braces would have to be removed. As to more general matters, Mother and Father both testified that they disagreed as to whether the two younger children needed psychological counseling. In addition, there was some testimony regarding restrictions placed on the children's being able to take certain belongings from one parent's home to that of the other. As proof contrary to the finding, Mother cites her testimony that she contacted Father about upcoming doctor appointments and tried to send reminder emails. While we have not been cited to evidence in support of some of the specific matters cited by the court, taking

4

the testimony of Mother and Father as a whole and in context, the evidence does not preponderate against the finding that the parties have not cooperated generally in matters relating to the well-being of the children.

Finding (4). Mother argues that the record does not support the finding, based on the volume of her court filings, that she has not cooperated with Father. In her brief, Mother identifies "three (3) separate and distinct actions" since October 4, 2012—a petition for modification of child support filed by the State on January 7, 2013; a notice of appeal filed by Mother, which related to a motion to alter or amend the 2012 order; and the petition for modification of parenting plan filed by Mother on May 3, 2013—and contends that these do not render her so litigious as to constitute a material change in circumstances. The record, however, shows that Mother filed three other pleadings which resulted in protracted litigation.

On November 2, 2012, Mother filed a Motion for Contempt in which, *inter alia*, she alleged that Father was "in arrears of [child] support by $48" and that Father had failed to pay his portion of certain medical bills from 2007 to 2012; she requested that "Father be directed to pay the overdue child support immediately." Related to the contempt motion, on that same date, filed a Motion for Production of Documents seeking copies of pay stubs and other evidence of income, as well as Father's payment of health care expenses. On November 2, Mother also filed a Motion to Alter or Amend the October 12 order in which she sought to correct what she asserted were errors in the calculation of the parties' incomes and health insurance payments and in the reduction in her parenting time with the oldest child. Following a hearing, the court dismissed the Motion for Contempt on the basis of *res judicata* and the Motion to Alter or Amend for not being properly filed with the original signature of counsel and not corrected in a timely manner. In that order, the court also directed that "the parties shall work together for the benefit of the children." We have reviewed the six pleadings and conclude that the timing and matters complained of and relief sought in the contempt motion; her failure to correct her Motion to Alter or Amend to comply with the appropriate rule of procedure which led to its dismissal; her inaccurate portrait of "three actions"; and the instruction that the parties work together for the sake of the children lends credence to determination that she has been uncooperative, as evidenced by her filings. The evidence supports this finding.

Finding (5). Mother next contends that the court erred in finding that "Stepfather giving Minor Children shots without consulting a physician and without Father's consent constituted a material change in circumstances." Mother argues that the evidence shows that Stepfather is a licensed pharmacist who can administer flu shots without consulting a physician, and that the only type of shot he administered to the children were, in fact, flu

shots; Mother also cites Father's testimony that he cannot recall an instance in which she failed to consult him on a decision with respect to the children.

The parenting plan states that Mother and Father would have joint decision-making authority with respect to non-emergency medical decisions regarding each child; the decision to administer flu shots falls within that category. Stepfather admits to giving the children flu shots; there is no evidence that Father was consulted. The fact that Stepfather can administer flu shots without consulting a physician does not establish compliance with the order. Moreover, the fact that Father could not recall an instance in which Mother failed to consult him is not dispositive of this issue. The holding that Stepfather's action was evidence of a change of circumstance is supported by the record.

Finding (7). With respect to the finding that Mother and Father foster an unhealthy atmosphere due to their animosity and lack of cooperation, Mother contends that the evidence only supports a finding that Father was uncooperative; she states that "the record is replete with examples of Father creating an unhealthy atmosphere," but she does not cite to evidence to support this contention. Father does not challenge the findings with respect to his lack of cooperation; in support of the court's finding, he cites testimony of the youngest child pertaining to Mother's behavior toward her.[3] The testimony cited by Father is evidence of the atmosphere in which the children live and, together with evidence pertinent to other factual findings, supports the holding that, by their behavior and animosity, Mother and Father have created an atmosphere that is detrimental to the children.

---

[3] The testimony cited by Father is as follows:

Q. Have you ever heard your mom say anything bad about your dad?
A. Before, like she's like said something like when I didn't eat maybe something, she was like because you're exactly like your dad.
Q. Does she say that in a good way?
A. No.
* * *
Q. Do you feel like you've been treated the same way - - well, wait - - have you told your mother that you want to stay with your father?
A. Yes.
Q. How many times have you told her that?
A. Once.
Q. Did things change since you told her that?
A. Like she's - - I think she probably been a little bit meaner, yes.
Q. Are you allowed to have friends over at your dad's house?
A. Yes.
Q. What about your mom's house?
A. Not anymore, no.

Finding (9). During the course of the hearing, Mother testified that one of the children had, on occasion, accessed websites containing pornographic images; Mother and Father testified that the same child engaged in an inappropriate relationship with a 23-year-old male. The court found that Mother and Father worked together to deal with what the court characterized as the child's "pornography issues" and the inappropriate relationship. Mother agrees with the finding that she and Father worked together relative to the child's relationship with the older male; she argues that the evidence does not support the finding that Father cooperated with Mother to address the child's access to pornographic images.

The testimony relative to this finding was conflicting as to whether Mother and Father cooperated. Mother testified that she installed an application on the child's iPod[4] to monitor her internet activity and prevent her from downloading applications without permission; that she gave Father the password to the application after he requested it; and that after doing so, she lost her ability to monitor child's internet activity. She also cites portions of Father's trial testimony in which he denies requesting the password to the internet application in order to delete it; his deposition testimony in which he admits "he did delete something"; and his conflicting testimony regarding whether he prohibited the child from taking the device to Mother's house. In response to Mother's argument, Father cites to evidence of his cooperation with Mother with respect to the child. He also cites to his trial testimony that he installed a monitor on the device as well as deposition testimony that he did not think he informed mother of the monitor. The trial court did not make a credibility determination or otherwise resolve the conflicting testimony, nor did it make a finding as to whether Father interfered with the application Mother installed on the device. In the absence of these findings, the testimony standing alone does not support the finding that Mother and Father cooperated to address the child's access to pornographic images.

As stated earlier, Mother agrees that the evidence supports four of the findings made by the court relative to the holding that there was a material change of circumstance. We have determined that the evidence does not preponderate against the other findings, with the exception of the finding that Father cooperated with Mother to address the child's access to pornography. Taken in their entirety and in context, the findings support the holding of a material change of circumstance sufficient to justify a modification of the parenting plan. Accordingly, we proceed to discuss the court's modification to the parenting schedule.

---

[4] Mother referred to this device as an iPod; Father referred to it as either a "phone" or "device". For ease of reference we will refer to it as a "device."

## B. Best Interest Determination

Mother's petition to modify the parenting plan was filed on May 3, 2013; Father filed his counter-petition on June 12, 2013; the hearing on the petitions was held June 19, 2014, and the order disposing of the petitions entered October 21, 2014. Prior to July 1, 2014, Tennessee Code Annotated section 36-6-106(a), which governs the development of parenting plans, listed ten factors to be considered by the court; on July 1, amendments to the statute took effect which, *inter alia*, added five factors to be considered. In the decision which is the subject of this appeal, the court applied the version of section 36-6-106 effective prior to July 1, 2014. In her brief, Mother contends that the court should have considered the fifteen factors in the statute as of July 1, 2014, and discusses the fifteen factors; likewise, Father discusses the fifteen factors in his brief on appeal. We agree that the fifteen factors at section 36-6-106 are the appropriate factors for the court to have considered. Inasmuch as the parties have briefed the fifteen factors, in our resolution of this appeal, we will first consider the court's determination of the factors in effect prior to July 1, 2014, and, as necessary, address the factors in effect after July 1, 2014.[5]

### 1. The Factors at Tennessee Code Annotated Section 36-6-106 Prior to July 1, 2014

The ten factors to be considered prior to July 1, 2014, and which were applied by the trial court, were:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers. The court

---

[5] We consider the factors added to the statute effective July 1, 2014 to be remedial in nature; thus, the statute can be applied retroactively. *See In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

9

Tenn. Code Ann. § 36-6-106(a) (2013).

The trial court found that factors (1),[6] (2)[7] and (3)[8] did not weigh in favor of Mother or Father; made no finding with respect to factor (4)[9]; found "no mental or physical health issues with the parents" concerning factor (5)[10]; as to factor (6),[11] the court held that "[t]he home school and community records of the children are good especially considering the animosity between parents"; and found that factor (8)[12] was not applicable. Neither Mother nor Father contend that the court erred in making the findings nor raise any issues with respect to these factors. Accordingly, we limit our review to the remaining factors.

*a.) Factor 7- The reasonable preference of the child[13]*

With respect to factor (7), the court found:

> The children prefer to live with their father. They are unequivocal and unwavering in their preference and they make believable witnesses. The Court finds their testimony credible. The girls want to go where they are not being yelled at, and where corporal punishment has been imposed by the stepfather. The Court gives greater weight to the preference of the older child over the younger child. This factor favors the Father.

While acknowledging that Tennessee Code Annotated section 36-6-106 required the court to consider the preference of the two children, Mother argues that "the record in this case does not indicate a reasonable preference of Minor Children;" and that the children's motivation for moving was based on not having to do as many chores at Father's house, having a less strict upbringing, getting an iPod, and not being grounded.[14]

---

[6]  This factor is comparable to factor (6) in the amended version of the statute.

[7]  This factor is comparable to factor (4) in the amended version of the statute.

[8]  This factor is comparable to factor (10) in the amended version of the statute.

[9]  There is no comparable factor in the amended version of the statute.

[10]  This factor is comparable to factor (8) in the amended version of the statute.

[11]  This factor is comparable to factor (9) in the amended version of the statute.

[12]  This factor is comparable to factor (11) in the amended version of the statute.

[13]  This factor is comparable to factor (13) in the amended version of the statute.

[14]  To support this argument, Mother cites the youngest child's testimony that she has to do more chores at Mother's and that Mother imposes harsher punishments than Father; she also cites the middle child's testimony in which she responded "I don't know" when asked if she would still prefer to live with Father if she had to do twice as many chores at his house than at Mothers, and her testimony that getting an iPod was one reason for wanting to live with Father.

10

As a separate issue, Mother contends the finding that the children were more credible than Stepfather is undermined by youngest child's age and both children's conflicting testimony.[15]

As the trier of fact, the trial court's function is to resolve conflicts in testimony; in performing this function, the trier of fact is often called upon to make credibility determinations of the various witnesses. Absent clear and convincing evidence to the contrary, we do not disturb the trial court's determination that minor children were credible witnesses. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). We have reviewed the testimony cited by both parties; the children do offer contrasting testimony at times and the same or similar testimony at others. The court heard the testimony and resolved the conflicts, partly on the basis of its finding that the children were credible witnesses. The mere fact that their testimony contrasts at times does not undermine the determination that the preference the children expressed is reasonable; the evidence does not preponderate against this determination. Neither do the conflicts or contrast in the children's testimony undermine the court's credibility determination or deprive it of the deference to which it is entitled. The court gave substantial weight to the children's preferences, as it is privileged to do, and did not abuse its discretion in doing so. *See Spencer v. Spencer*, No. M2014-01601-COA-R3-CV, 2016 WL 761109, at *6 (Tenn. Ct. App. Feb. 25, 2016) ("[W]e are mindful of the broad discretion trial judges hold in fashioning parenting arrangements, especially given their ability to 'observe the witnesses and make credibility determinations'") (quoting *Massey–Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

---

[15] As evidence of the youngest child's conflicting testimony, Mother cites testimony in which the child offered differing answers as to whether she overheard Mother call middle child her favorite or was told so directly by Mother; her testimony that Mother is "mean", which Mother argues is contradicted by youngest child's subsequent testimony admitting that Mother and Stepfather do things out of love. As evidence that the youngest child is not credible, Mother cites to the child's testimony that she could only recall certain events because, before trial, the child was able to read from a notebook which she began keeping after the oldest child went to live with Father; Mother also argues that the youngest child was grounded at Mother's house at the time she testified that Mother was more strict than Father.

As evidence that youngest child's and middle child's testimony was "directly contradictory," Mother cites only portions of middle child's testimony that she never observed Stepfather call youngest child names or get physical with her, and that she is not allowed to have friend's over Mother's house and her subsequent testimony in which she recalled an occasion Mother allowed a friend to visit.

*b.) Factor 9- The character and behavior of any other person in the home*[16]

With respect to this factor, the court stated:

The Court is concerned with the nature and character of the Step-Father who has chosen to ignore the Court's order concerning punishment of the children. The Court is further concerned with his decision to surrender his parental rights to his other child even though the Court is sympathetic to his rationale behind the decision. The Court is also concerned with the nature and character of the Step-Mother who will not put down Facebook for the sake of her Step-Daughters. The Court is concerned with the character and nature of an uncle who will not tell the Father that he had been drinking alcohol and takes a risk to transport his nieces anyway. The Court is concerned with the method and manner that the Step-Father employs for immediate discipline. The Court's greatest concern here is the manner that the Step-Father approaches the children. The Court credits the children's testimony concerning his yelling and what he calls them over the testimony of the Step-Father. The factor favors the Father.

Mother contends that the concerns expressed by the court regarding Stepfather's use of corporal punishment despite the court's order,[17] the surrender of his parental rights to his son, and his yelling at the children, as well as the finding that this factor favored Father, are not supported by the record. Upon our review of the record, there is evidence to support the court's concerns as to Stepfather, other than with respect to Stepfather's use of corporal punishment in violation of the October 2012 order.[18]

The evidence with respect to the surrender of Stepfather's parental rights to his son was Stepfather's testimony that his son suffered from behavioral issues, which resulted in the son not being allowed around the girls without adult supervision; and his belief that his decision to surrender his parental rights to his son was best for all of the children. With respect to the court's "greatest concern" relative to the Stepfather's treatment of the children, in addition to the testimony by youngest and middle child that

---

[16] In the amended version of the statute, this factor is comparable to factor (12).

[17] In the order entered October 10, 2012, the court ordered that no corporal punishment be used relative to the oldest child.

[18] The only evidence relative to corporal punishment was Stepfather's testimony that he used corporal punishment on youngest child in the summer of 2011; this was prior to the October 2012 order.

Stepfather yelled at them, discussed earlier, Stepfather admitted to raising his voice at the girls. The youngest child also testified that Stepfather yells at her on a weekly basis, has called her explicit names, and has "grabbed" her.

Mother also argues that the court erred in finding that this factor favored Father, contending that that the evidence shows that Stepmother has shown "incredibly poor parenting skills," that Stepmother's Facebook posts "contain vile and inappropriate language," and that Stepmother "disparages Mother on Facebook publically [sic] and to Minor Children." Mother also relies on Stepmother's testimony that she can "post whatever [she] feel[s] and want[s]" on her Facebook account; that Stepmother found humor in oldest child's use of an expletive on Facebook; and testimony by Stepmother concerning negative statements she posted on Facebook, which Mother claims were directed at her. In response to Mother's contention, Father points to Stepmother's testimony that she has taken measures to make sure minor children cannot view her Facebook content; that she recognizes her language at times was not appropriate; and that she would make sure not to post inappropriate content in the future.

While there is evidence that Stepmother engaged in problematic behavior, the finding that this one factor favored Father focused on the physical and emotional well-being of the children and gave substantial weight to Stepfather's conduct with the children—which the court articulated was its "greatest concern. The evidence does not preponderate against the trial court's finding in this regard.

> c.) Factor 10- Each parent's potential for future performance of parenting responsibilities[19]

The court stated the following as to factor 10:

> The Mother shows greater future potential for performance of parenting responsibilities than does the Father. She will clearly go farther to facilitate and encourage a relationship than Father will. This factor favors Mother.

In her brief, Mother states that she "agrees with this finding of the Trial Court"; however, she argues that the court did not place enough weight on this factor, and that this finding should have justified her being named Primary Residential Parent.

---

[19] This factor is comparable to factor (2) in the amended version of the statute.

In our consideration of Mother's argument in this regard, we are guided by the standard for reviewing a trial court's decision as to the weight to be given particular factors set forth *Spencer*:

> Mother contends the trial court failed to place the appropriate weight on several factors, including the fact that she has been the child's primary caregiver. We have reviewed the statement of the evidence approved by the trial court and have considered Mother's arguments regarding the weight the trial court assigned to particular factors. In sum, we cannot say the trial court abused its discretion in devising a residential schedule that allows both parties "to enjoy the maximum participation possible in the life of the child." Tenn.Code Ann. § 36-6-106(a). In reaching this conclusion, we are mindful of the broad discretion trial judges hold in fashioning parenting arrangements, especially given their ability to "observe the witnesses and make credibility determinations." *Massey–Holt v. Holt,* 255 S.W.3d 605, 607 (Tenn. Ct. App. 2007). . . . The result reached by the trial court is not outside the spectrum of rulings that reasonably results from applying the correct legal standards to the evidence. Therefore, we decline to "tweak" the parenting plan in the hopes of achieving a more reasonable result. *See Eldridge [v. Eldridge],* 42 S.W.3d [82] at 88 [(Tenn. 2001)].

2016 WL 761109, at *6.

We have considered Mother's argument as well as the evidence presented, and conclude that the court did not abuse its discretion with respect to the weight it assigned to this factor in the course of the determination of who should be designated primary residential parent. While the court found that this factor weighed in Mother's favor, the court considered other factors, including the preference of the children to live with Father and the concerns with Stepfather's behavior toward the children. In its discretion, the court assigned weight to each factor, and in doing so, did not reach an illogical or incorrect result.

### 2. The Factors at Tennessee Code Annotated § 36-6-106 effective July 1, 2014

We next examine the factors in the version of Tennessee Code Annotated section 36-6-106 as of July 1, 2014,[20] which were not addressed by the trial court, i.e., factors

---

[20] Factors (1)-(15) are:

(1) The strength, nature, and stability of the child's relationship with each parent,

14

including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (2014).

(1), (3), (5), (7), (14), and (15). Of those factors, we have determined that factor (3) is not applicable, as there is no evidence in the record that either parent refused to attend a court ordered parenting seminar; factor (14) is not applicable, as there is no evidence that either parent has an employment schedule that necessitates an accommodation. In their briefs, the parties do not contend that factor (15) applies or cite to evidence pertinent to this factor, and in our review, we do not find evidence pertinent to this factor. Thus, our analysis is confined to factors (1), (5), and (7). Inasmuch as the trial court did not consider the factors in its ruling, we make the determination of the applicability of the factors to the evidence in the first instance.

> *(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child*

As cited by Father and upon our review of the record, the evidence of the strength and nature of the children's relationship with each parent consisted of the youngest child's testimony that Mother "grabbed" the child's face and yelled at her; the middle child's testimony that she was more afraid of Mother than Father; and both children's testimony that they preferred to live with Father. We agree that this testimony is evidence that is pertinent to this factor inasmuch as it addresses specific concerns the children have, primarily with Mother's treatment of them. Their preference to live with Father; their testimony of Mother's behavior towards them; and the youngest child's expressed fear of Mother is evidence that the children's bond is stronger and the nature of their relationship better with Father. This factor favors Father.

> *(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities*

Father argues that he has taken more responsibility for performing parental responsibilities with respect to the oldest child; he concedes that "with regard to the two youngest children it would appear both parents have been equal caregivers…." Mother does not make an argument as to this factor in her brief on appeal. As respects the two youngest children, there is no evidence in the record to indicate that either party has taken on greater parental responsibilities. Accordingly, this factor favors neither parent with respect to the two youngest children; with respect to oldest child, this factor favors Father.

16

*(7) The emotional needs and developmental level of the child*

The evidence of the emotional needs and development level of the children consisted of Father's testimony that Mother does not want the oldest child to seek counseling, despite his belief that the oldest child needs counseling to address her low self-esteem and that he believes all three children would benefit from psychological counseling, as well as youngest child's testimony that Stepfather calls her names and that she threatened to commit suicide if she had to live with Mother.[21] While this evidence does not establish that the children have serious emotional or developmental needs, taken with their testimony that they prefer to live with Father and Father's testimony that, in his opinion, the children have emotional issues and would benefit from counseling, we conclude that this factor favors Father.

Upon our review of the ten factors listed at Tennessee Code Annotated section 36-6-106 prior to July 1, 2014 which were considered by the court in rendering its decision, as well as the additional factors as of July 1, 2014, the majority of the factors weigh in Father's favor. The evidence does not preponderate against the court's determination that Father be named primary residential parent.

## C. Decision-Making Authority

After naming Father primary residential parent, the court stated the following:

> Given the Court's previous analysis, the Court vests major decision making with the Father. The Court requires the Father to consult with the Mother and consider her input in major decisions before finally making major decisions.

---

[21] The testimony pertaining to youngest child's threat was as follows:

> Q: Do you remember telling your dad that you would kill yourself if you had to –
> Mr. Fort: Objection, leading.
> The Court: Sustained. Don't suggest an answer.
> Q: (By Ms. Stewart) Have you ever said you would do something to yourself if you had to stay with your mom?
> A: Yes.
> Q: What have you said, sweetie?
> A: Kill myself.
> Q: Are you that unhappy?
> A: (Witness nods head.)
> The Court: If you need a tissue, there's one over to your right. Do you need to take a break? Let's take about two minutes.

The parties will make day to day decisions when the children are with them.

Mother contends that the court erred in vesting Father with sole decision-making authority.

"Residential schedule and parenting responsibility decisions are peculiarly within the broad discretion of the trial judge; accordingly, we review these decisions under an abuse of discretion standard." *Christie v. Christie*, No. M2012-02622-COA-R3-CV, 2014 WL 4293966, at *2 (Tenn. Ct. App. Aug. 28, 2014), appeal denied (Jan. 15, 2015) (citing *Eldridge*, 42 S.W.3d at 85. A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision against logic or reasoning and causes an injustice to the complaining party. *Id.*

In allocating decision-making authority, Tennessee Code Annotated section 36-6-407 requires the court to consider the following factors:

(1) The existence of a limitation under § 36-6-406;
(2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;
(3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and
(4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. § 36-6-407(c)(1)-(4).

Mother argues that, of the four factors, the only factor upon which proof was presented was factor (3). As evidence that she should be allocated decision-making authority, Mother cites to her testimony that she attempts to make joint decisions with Father; Father's testimony that he could not recall an instance in which Mother did not consult him before making a decision; and his testimony that he did not want oldest child to get braces. Father does not cite evidence to support the trial court's decision; he argues that Mother has shown a lack of cooperation with oldest child's extracurricular activities and in refusing to allow the children to get psychological counseling.

18

While the trial court did not cite Tennessee Code Annotated section 36-6-407 in rendering its decision, the evidence recounted by the court in its discussion of the factors pertaining to the children's best interest, as referenced in the statement, "Given the court's previous analysis," supports the decision to award Father sole decision-making authority. As noted earlier, the court found that Mother and Father have not cooperated on certain decisions with respect to the children and that both parents have fostered an unhealthy atmosphere for the children due to their continued animosity and lack of cooperation. We have previously held that the evidence does not preponderate against that finding, which relates to factors (2) and (3) at section 36-6-407(c). The court's decision to allocate decision-making authority to Father was supported by the evidence and complied with the correct legal standard.

### D. The Oldest Child's Vacation Schedule

Mother argues that the trial court erred in not modifying oldest child's Spring Break, Fall Break, and Christmas Break schedule. She states, *inter alia*:

> Due to the Court's requirement that the holiday schedule follow the "regular schedule" Mother is never permitted a Spring Break, Fall Break, or even Christmas Break with Minor Children. Such a decision is not based upon any proof submitted at trial. Mother should receive holiday parenting time with Minor Children in an equal amount to that of Father. Mother receives week on/week off parenting time in the summer so there is clearly no justifiable reason that she should not receive Spring Break, Fall Break, on an alternating schedule with Father and ½ of the Christmas Break with Minor Children.

In the 2012 plan, the residential parenting time schedule for the two youngest children was week on/week off with Mother; the oldest child spent every other weekend with Mother. As respects Spring Break and Fall Break, the plan stated that "the day-to-day schedule shall apply"; the Christmas Vacation schedule was "Christmas Eve morning at Nana's. Christmas Eve night with Denise. Christmas Day morning with Mother's grandparents. Christmas nght [sic] at Meme's." We have not been cited to any testimony as to how the children spent the remainder of Christmas Vacation or how residential parenting time was exercised during the remainder of the break. As a result of the modification in the October 21, 2014 ruling, the day-to-day schedule for all three children changed, and they spent every other weekend with Mother and the Spring Break and Fall break was to follow the day-to-day schedule; the provision for Christmas Vacation was the same as that in the 2012 plan. Under the modified plan, Mother would not have visitation with any of the children during Fall and Spring Break; in the absence

19

of evidence as to how the remainder of the Christmas Vacation is spent, we cannot discern what parenting time Mother would have with children during that period.

Tennessee Code Annotated section 36-6-106(a) provides that, in determining the children's best interest, the court "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible…consistent with the factors set out…." In the absence of specific findings by the court relative to Mother's parenting time during vacation periods, the order does not appear to comply with the statute and, as a consequence, we are unable to affirm the schedules for the vacation periods. Accordingly, we vacate this portion of the judgment; we remand the case for the court to reconsider Mother's parenting time for the Fall, Spring, and Christmas breaks in accordance with section 36-6-106 and to make appropriate findings relative thereto.

## IV. CHILD SUPPORT GUIDELINES

### A. Calculation of Mother's Income for Child Support Purposes

### 1. Income from Employment

Because the residential parenting schedule was modified, the court was required to recalculate Mother's child support obligation. The trial court found that Mother's 2014 income for child support purposes was $44,321.88; Father contends this was in error. Specifically, he argues that the court erred in calculating Mother's income based on W-2 statements alone rather than, in the case of her civilian employment,[22] also considering other information contained on the leave and earnings statement entered into evidence as part of Exhibit 19[23]; in not including $12,827.21 of debt which was cancelled in 2013; and in not including the amount of certain "non-taxable benefits" Mother received.

---

[22] Mother testified that she works for the Department of the Army and is paid for two jobs, which she referred to as "civilian" and "military"; we will use that characterization in our discussion.

[23] Exhibit 19 consisted of documents produced by the Defense Finance and Accounting Services pursuant to a subpoena *duces tecum*, seeking W-2s for 2012 and 2013 and payroll information for 2014 for Mother's civilian and military pay. There were two Civilian Leave and Earnings statements included in the exhibit, one for the pay period ending December 14, 2013, and the other for the pay period ending April 19, 2014. Father argues that the Civilian Leave and Earnings statement "shows she actually made $41,349.60 once all benefits are considered," and, therefore, preponderates against the court's finding.

References herein to Exhibit 19 are to the Civilian Leave and Earnings statement for 2013, unless otherwise noted.

The trial court acknowledged and rejected Father's argument relative to the calculation of Mother's gross income in its ruling on Father's motion to amend the order, holding:

> Father urges, and not for the first time, that the Court has not considered all Mother's income and should increase the amount of pay used in the child support calculations. This is not the first opportunity Father has had to argue this position. The meat of the latest argument is an urging for the Court to reconsider Exhibit 19 from the trial of the cause and change the amount of the Mother's gross income based upon the theory that the Court did not give proper consideration to the income of the Mother based upon its non-taxable nature. This issue was highly contested during the trial, including but not limited to an investigation of whether there was a forgery or alteration of the documents that make up [Mother's] pay records. The Court considered these records extensively at the trial. The corollary urging surrounding the determination is the theory that the Court did not consider all of Mother's income from her job that has both a civilian and military component.
>
> Respectfully, the Court believes that it did consider the income in Exhibit 19 as well as the testimony of Mother regarding the amount of monies she is making. The Court has no credibility issue with Mother concerning her income.

The holding that Mother's gross income for child support purposes was $44,321.88 is supported by her testimony and the W-2s. Mother projected her 2014 income from civilian employment to be $34,301.32, based on her hourly rate of $21.28 applied to the 1,612 hours she worked in 2013, and incorporating a $0.83 per hour raise effective January 1, 2014. Similarly, with respect to her military income, Mother's W-2 for 2013 reported social security wages of $9,921.23, paid at a rate of $129.19; she projected her 2014 military income to be $10,020.56, based on a rate of $130.48.[24]

The court considered Father's argument as well as the information contained in Exhibit 19 and, in determining Mother's income, credited her testimony as to the amount she made. Father cites no evidence to support his argument and did not introduce any evidence of the nature or values of any such fringe benefits nor did he project any figure

---

[24] Mother testified that her military income was not paid hourly; she did not specify how the rate was established, although a chart entered as Exhibit 14, entitled "Army Reserve Pay," included the rates for 2013 and 2014 under a column headed "$ Per UTA/AT." This is evidence supporting the figure for her military income.

for Mother's gross income; he merely argues that in light of Mother's nontaxable fringe benefits, "an amount must be imputed on top of the amount actually received in calculating Gross Income." The determination of Mother's gross income for child support purposes is consistent with the applicable regulation[25] and the evidence does not preponderate against the court's finding that Mother's 2014 income from her civilian and military employment was $44,321.88.

---

[25] Pursuant to the Child Support Guidelines, gross income is determined as follows:

1. Gross income of each parent shall be determined in the process of setting the presumptive child support order and shall include all income from any source (before deductions for taxes and other deductions such as credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following:

(i) Wages;
(ii) Salaries;
(iii) Commissions, fees, and tips;
(iv) Income from self-employment;
(v) Bonuses;
(vi) Overtime payments;
(vii) Severance pay;
(viii) Pensions or retirement plans including, but not limited to, Social Security, Veteran's Administration, Railroad Retirement Board, Keoghs, and Individual Retirement Accounts (IRAs);
(ix) Interest income;
(x) Dividend income;
(xi) Trust income;
(xii) Annuities;
(xiii) Net capital gains;
(xiv) Disability or retirement benefits that are received from the Social Security Administration pursuant to Title II of the Social Security Act, whether paid to the parent or to the child based upon the parent's account;
(xv) Workers compensation benefits, whether temporary or permanent;
(xvi) Unemployment insurance benefits;
(xvii) Judgments recovered for personal injuries and awards from other civil actions;
(xviii) Gifts that consist of cash or other liquid instruments, or which can be converted to cash;
(xix) Prizes;
(xx) Lottery winnings; and
(xxi) Alimony or maintenance received from persons other than parties to the proceeding before the tribunal.

Tenn. Comp. R. & Regs. 1240-02-04-.04 (3)(a)(1).

## 2. Cancellation of Debt

Next, Father argues that Mother had debts totaling $12,827.21 cancelled in 2013 and that this figure should have been included in the calculation of her income for child support purposes.

Mother testified that the debt in question had been allocated to her husband from a previous marriage under the terms of their marital dissolution agreement; that after he failed to pay the debt, she negotiated a reduced payoff and satisfied the debt; and that she received three 1099(c) forms evidencing the cancellation. Mother argues that Father's contention should fail because the debt was cancelled in 2013, prior to the trial on this matter, and because for the purpose of calculating child support, the debt was incurred prior to the birth of the children, and any benefit from this debt was received at the time the debt was incurred, not discharged.

We agree that the court properly excluded the amount of the forgiven debt from the calculation of Mother's income. The amount of debt forgiven is not specifically included in the definition of income in the Child Support Guidelines. Moreover, the forgiveness of the debt was a one-time event and produced no income in 2013 or 2014. There is no basis from which to conclude that the amount of the debt should be included as part of the calculation of Mother's 2014 income or that the court erred in not considering it.

## B. Father's Insurance Payments

The parenting plan requires both parents to maintain reasonable health insurance for the children. The child support worksheet states that Mother incurs $294.41 for the children's portion of her health insurance, and allocates Father's share of that expense to be $158.98. Father contends that he is entitled to a credit on his share because he pays Stepmother $88.00 monthly to reimburse her for the portion of the monthly premium for health insurance she received through her employment which was attributable to his children.

Addressing this matter in the October 21, 2014 hearing, the court held:

> The Father will get no credit for paying his wife for insurance coverage under the Court's interpretation of the guidelines. The Court will allow for Mother to have a credit on the child support worksheet for her insurance cost for the girls.

23

Father sought reconsideration of the ruling on the motion to alter or amend. The court dismissed the motion, stating:

> Next counsel argues that the Court should have granted Father a credit for the $88.00 per month health insurance premium reimbursement made from Father to his present wife. This exchange of funds occurred via check from Father to his present wife in exchange for her putting the entire family on her family plan of insurance at her work. The checks are not made out to the insurance provider and credited toward the premium. The checks are simply made to the present wife and purportedly cashed by her. There are insufficient indicia of reliability here for the Court to give a credit under these circumstances. Secondly, the Court considered this argument in formulating the prior order. There are no new facts or change in the law here. The Court has previously exercised its discretion in not allowing the credits.

The Child Support Guidelines state that "the cost for the child's health insurance premium…shall be divided between the parents pro rata…." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(3). Moreover, "'[a]mounts paid by a step-parent shall not be considered in the calculation' of child support." *In re Grace N.*, No. M2014-00803-COA-R3-JV, 2015 WL 2358630, at *11 (Tenn. Ct. App. May 14, 2015) (pet. to rehear denied (Tenn. Ct. App. June 9, 2015); no perm. app. filed) (quoting Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(6)). Stepmother testified that she pays a total of $108.00 a month for health insurance and receives $88.00 per month from Father in reimbursements in the amount attributable to him and children; that seven people are currently covered by her health insurance plan; that the children's portion of her health insurance premium is $46.42 per month; and that she did not plan on reimbursing Father for his overpayment. In addition to Stepmother's testimony, the evidence of the health insurance payments was Father's testimony that he pays Stepmother $88.00 per month for health insurance for the children; nine checks in the amount of $88.00 each written out to Stepmother and signed by Father, dating from October 31, 2013 to June 12, 2014; and a copy of Stepmother's payroll stub, listing certain deductions.[26]

"The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *In re I.E.A.*, No. W2016-00304-COA-R3-CV, 2016 W3997421 at *4 (Tenn. Ct. App. July 20, 2016) (citing *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)). As noted above, under the guidelines, payments made by a stepparent are not

---

[26] The payroll stub did not list the amount deducted from Stepmother's paycheck for her health insurance.

included in the calculation of child support. While Father concedes this point in his brief, he argues that, because he made the actual payments, he should get credit. The court determined that the evidence, including the differing amounts stated by Father and Stepmother as to the portion of her health insurance premium attributable to the children and the checks written by Father to Stepmother, was insufficient to establish that Father was entitled to a credit in the amount of $88.00; the court did not abuse its discretion in weighing the testimony, and we decline to disturb the court's holding in this regard. *See Konvalinka v. Chattanooga-Hamilton County Hospital Authority,* 249 S.W.3d 346, 358 (Tenn. 2008) ("[R]eviewing courts will set aside a discretionary decision only when the court that made the decision . . . based its decision on a clearly erroneous assessment of the evidence. . . .").

## V. ATTORNEY'S FEES

On April 9, 2014, the day the petitions were set for hearing, Father moved for a continuance and for leave to amend his counter-petition, asserting that documents he had received the month prior "show [Mother] intentionally and fraudulently manipulated and falsified the face of her 2012 W2." The parties entered into an agreed order on May 2 continuing the hearing and allowing the amendment[27]; of pertinence to this issue, the order provided:

> 5. Attorney's fees relating to this continuance shall be reserved and the parties agree the Court should consider the timing of the events leading to the continuance and the seriousness of the allegation made when accessing [sic] attorney's fees for continuance, additional procedure, effort and inconvenience related to the new allegation that Mother has falsified her income by intentionally and fraudulently falsified [sic] and manipulated [sic] the face of her 2012 W2 and 2013 W2.

On May 2, 2014, Father filed a Notice advising that he "will not assert the claim of fraud in the above-noted matter in the Amended Counter Petition, nor will I require an Answer on the Amended Petition." There is nothing in the record to indicate that Mother sought to have the court award fees pursuant to the order entered May 2.

Mother contends that she was entitled to an award of attorney's fees for services at the trial court level because of the May 2 order as well as "the facts of the case as a whole." Mother's argument in support of this issue relates almost entirely to the circumstances surrounding the entry of the May 2 order. Inasmuch as this was

---

[27] It is obvious there was some delay in the preparation of the order and its signature by the court and entry by the clerk.

specifically reserved by the parties and not subsequently presented to the court, we do not find that the court erred in not making an award pursuant to the May 2 order.

Although not relied upon by Mother in her argument, Tennessee Code Annotated section 36-5-103(c)[28] provides authority for an award of fees in a case of this type, and we shall consider her argument in the context of this statute. The statute provides that an award of fees is in the discretion of the trial court. Other than the general statement quoted in the immediately preceding paragraph, Mother offers no argument or evidence in support of her contention that she was entitled to attorney's fees for the trial. Mother and Father filed competing petitions to modify the parenting plan and Mother did not prevail at the trial court level. Under these circumstances, we discern no abuse of discretion in denying her an award of attorney's fees.

Mother and Father both request an award of attorney's fees incurred in this appeal. "The decision whether to award attorney's fees incurred on appeal is a matter within the discretion of this Court." *Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 587 (Tenn. Ct. App. 2012) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995); *Seaton v. Seaton*, 516 S.W.2d 91, 93 (Tenn. 1974)). In making our determination, we are mindful of "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor." *Dulin v. Dulin,* No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003).

Upon the record before us, in our discretion, we decline to award attorney's fees to either party. There is nothing in the record from which to conclude that the issues presented in this appeal were not pursued in good faith and, as is evident from the length and depth of this opinion, were substantive.

---

[28] That subsection states:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c).

## VI. Conclusion

For the foregoing reasons, we vacate that portion of the judgment setting the parenting schedules for the Fall, Spring, and Christmas vacation periods and remand for reconsideration in accordance with section 36-6-106 and to make appropriate findings relative thereto; in all other respects we affirm the judgment of the trial court.

RICHARD H. DINKINS, JUDGE

27